## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

ERIN G.,

                                        Plaintiff,

        v.

                                                        1:20-CV-1595
COMMISSIONER OF SOCIAL                                   (ATB)
SECURITY,

                                        Defendant.

ANDREW C. ALTER. ESQ., Legal Services of the Hudson Valley, for Plaintiff
NICOLE BOUDREAU, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER
United States Magistrate Judge

### MEMORANDUM-DECISION AND ORDER

        This matter was referred to me, for all proceedings and entry of a final judgment,

pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in

accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y.

Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 3, 5).

## I.    PROCEDURAL HISTORY

        On May 24, 2018, plaintiff protectively filed an application for a period of

disability and disability insurance benefits ("DIB"), alleging that she became disabled

on December 27, 2016. (Administrative Transcript ("T.") 85 (protective filing date),

190-93 (application), 206 (alleged disability onset date)).  Her application was denied

initially on August 31, 2018. (T. 85, 100-104).  Plaintiff requested a hearing, which was

held by video conference on November 20, 2019 before Administrative Law Judge

("ALJ") Dennis G. Katz. (T. 67-84).[1]  During the hearing plaintiff amended her onset

date to November 28, 2017. (T. 69).  Plaintiff and Vocational Expert ("VE") Linda A.

Stein testified at the hearing. (*Id.*)  ALJ Katz issued an unfavorable decision on

December 18, 2019, which became the Commissioner's final decision when the

Appeals Council denied plaintiff's request for review on October 27, 2020. (T. 1-5, 15-

30).

## II.   GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI

disability benefits must establish that she is "unable to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In

addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such  severity
> that [she] is not only unable to do [her] previous work but cannot,
> considering [her] age, education, and work experience, engage in any other
> kind of substantial gainful work which exists in the national economy,
> regardless of whether such work exists in the immediate area in which
> [she] lives, or whether a specific job vacancy exists for [her], or whether
> [she] would be hired if [she] applied for work

42 U.S.C. § 1382(a)(3)(B).  The Commissioner uses a five-step process, set forth in 20

---

[1] Plaintiff's hearing was originally scheduled for August 15, 2019.  On that date, plaintiff appeared before ALJ Katz and requested an adjournment so that she could obtain counsel. (T. 60-66). After asking plaintiff some initial background questions, the ALJ granted the adjournment, and the hearing was reconvened and completed on November 20, 2019. (T. 60-66, 67-84).

C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI

disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity. If [she] is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits [her] physical or mental ability to do basic work
> activities. If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has an impairment
> which meets or equals the criteria of an impairment listed in Appendix 1 of
> the regulations. If the claimant has such an impairment, the
> [Commissioner] will consider [her] disabled without considering
> vocational factors such as age, education, and work experience …
> Assuming the claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment, [she] has the
> residual functional capacity to perform [her] past work. Finally, if the
> claimant is unable to perform [her] past work, the [Commissioner] then
> determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920. The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that her impairment prevents her from performing

her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v.*

*Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir.

2012). It must be "more than a scintilla" of evidence scattered throughout the

3

administrative record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III.   FACTS

Plaintiff was born on March 16, 1979 and was forty years old at the time of the ALJ's hearing. (T. 190).  She lived in a home with her husband and children.[2] (T. 74).

---

[2] Plaintiff's husband was a contractor, who at the time of the hearing was working full-time at a home improvement store. (T. 74).

4

She claimed disability due to bipolar disorder and gastroparesis.[3] (Pl.'s Br. at 5).[4]

Plaintiff testified that she had post-partum depression after the birth of her second child

in 2014. (T. 70).  She stated that she "very quickly got pregnant again" with her son, so

it became "pre-partum" depression, and it "spiraled out of control since then,"

continuing after her son's birth in 2015. (*Id.*)  Plaintiff testified that the depression got

so bad that she could not get out of bed and had "suicidal ideology." (T. 70-71).

Plaintiff testified that she was also diagnosed with anxiety, bipolar disorder, and

agoraphobia, which all combined to keep her from working. (T. 71).  Plaintiff claimed

that she could not leave her house without assistance. (T. 73).  Plaintiff testified that she

got up in the morning, got her children off to school, and then tried to get the house

clean. (T. 74).  However, she stated that she spent most of the time pacing back and

forth. (T. 74).  Plaintiff stated that her husband took care of the children and did most of

the chores, including cooking dinner when he got home from work.[5] (T. 74-75).

Plaintiff testified that her husband prepared everything for the children before he

---

[3] Gastroparesis affects the normal spontaneous movement of the muscles in the stomach. The stomach's motility is slowed or fails to work, preventing the stomach from emptying properly. https://www.mayoclinic.org/diseases-conditions/gastroparesis/symptoms-causes/syc-20355787.  Some of the symptoms of gastroparesis include interference with normal digestion, nausea, vomiting and abdominal pain. *Id.*

[4] The administrative transcript references a variety of alleged impairments.  Plaintiff's initial application alleged disability based upon depression, anxiety, agoraphobia, and bipolar I "with mixed features." (T. 87, 209).  Plaintiff's initial denial listed "migraine" and "affective disorder" as her impairments. (T. 85). Plaintiff testified that she suffered from depression, anxiety, bipolar disorder, and agoraphobia. (T. 71-72).  Plaintiff does not argue that the ALJ failed to properly analyze her physical impairments.  At the hearing she stated that she had gastroparesis, but that is not the focus of her claims herein. (T. 72-73).

[5] Plaintiff testified that her husband cooked, shopped, did the laundry, and took care of the family finances. (T. 76).

left for work in order to assist the plaintiff in getting the children ready for school. (T. 75).  After the children left for school, and plaintiff was alone, she stated that she would lay in bed. (T. 75).  She also tried to keep the house clean, but she did not cook for herself during the day. (T. 75).  Plaintiff's husband handled all the telephone calls because plaintiff was too anxious to talk to people on the telephone. (*Id.*)  Performing daily activities caused panic attacks. (*Id.*)

Plaintiff testified that her husband also took her to doctors' appointments, and that some of her medical providers accommodated her by seeing her on the same day so that she did not have to take multiple trips. (T. 77).  Plaintiff stated that she had a driver's license, and that she could drive if "necessary," but that her anxiety was so bad that she "choose[s] not to." (T. 79).  Plaintiff testified that her symptoms and improvements fluctuate.  Sometimes it appears her providers have prescribed the correct combination of medications, and the next week "it turns the other way and [they] don't." (*Id.*)  Plaintiff testified that treating Nurse Practitioner ("NP"), Andrea Rosa believed that plaintiff should consider "partial hospitalization" to see if more intense therapy would lead to further improvement. (T. 77-78).

The ALJ noted that plaintiff had a long work history. (T. 79).  Plaintiff last worked as a radiology assistant. (T. 80).  In this position, plaintiff had a substantial number of responsibilities, including

> watching the work list for 125 facilities and ensuring the
> radiologist turn around times making sure that stroke cases
> were read within a 10 minute time frame and making
> sure we found the radiologist and the radiologist saw it.
> Making sure the radiologist had all of the images they needed
> that there was nothing missing. Any questions they had we

were responsible for hunting down the answers. Any other
information that was missing. Calling in positive results to
physicians. Things of that nature.

(T. 80).  Plaintiff testified that she stopped working because she was put on bed-rest

during the 2015 pregnancy for physical reasons, and then the depression "did not allow

[her] to go back afterward[]." (T. 81).  Plaintiff testified that she had not applied for any

jobs since that time, even those that were "slower paced," because she felt that she

could not "handle the skills . . . ." (T. 81-82).

The ALJ then heard testimony from VE Stein. (T. 81-83).  VE Stein was asked to

describe plaintiff's previous work activity. (T. 81-82).  Plaintiff's work was classified

as a "radiology administrator." (T. 82).  It was a skilled, sedentary position with an

SVP[6] of 7. (T. 83).  The ALJ then asked the VE whether an individual could perform

work if he or she could not consistently get out of bed or out of the house. (T. 83).  The

VE stated that such an individual could not perform full-time gainful employment. (*Id.*)

No further questions were asked of the VE, either by the ALJ or by plaintiff's counsel.

There is a substantial amount of medical evidence in the administrative record.

Rather than reciting the evidence at the outset, I will discuss the relevant materials in

my analysis of plaintiff's claims.

## IV.   **THE ALJ'S DECISION**

At step one of the sequential evaluation, the ALJ found that plaintiff was not

---

[6] SVP stands for Specific Vocational Preparation. https://www.onetonline.org/help/online/svp.
The SVP number correlates to the amount of time required for a typical worker to learn the techniques,
acquire the information, and develop the facility needed for average performance in a specific job
situation. *Id.*  An SVP of 7 indicates that the job will take 2 years up to and including 4 years to learn.
*Id.*

engaging in substantial gainful activity and had not done so since November 28, 2017, the amended onset date. (T. 17).  At step two, the ALJ found that plaintiff had the following severe impairments: obesity, gastroparesis, irritable bowel syndrome ("IBS"), and a bipolar disorder. (*Id.*)  The ALJ found that plaintiff's migraines could not be considered severe because there was no evidence that the headaches caused more than a slight limitation in function for 12 or more consecutive months, and there was little record of treatment for migraines in the record since plaintiff's onset date.[7] (*Id.*)  The ALJ also determined that plaintiff had a "left shoulder impairment" that was not severe because there was no evidence that the impairment lasted for the requisite twelve months. (T. 18).

    At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments of listing-level severity. (*Id.*)  The ALJ considered Listing 5.06 (Inflammatory Bowel Disease) and Listing 12.04 (Depressive, Bipolar, and Related Disorders). (T. 18-20).  Finally, the ALJ noted that obesity is not a listed impairment, but when making his RFC determination, he considered plaintiff's obesity in accordance with Social Security Ruling ("SSR") 19-2p,[8] for its potential effects on the plaintiff's other impairments and when considering whether the other impairments rose to the level of listing severity. (T. 20).  The ALJ noted that no doctor indicated that the plaintiff's obesity caused any greater limitations than already assessed. (*Id.*)

---

    [7] Notwithstanding this finding, in his RFC determination, the ALJ found that plaintiff was not able to work in places where she would have "constant exposure to constant, high levels of loud noise." (T. 18).

    [8] SSR 19-2p is a lengthy ruling, outlining the procedure for considering cases with obesity as an impairment.

At step four, the ALJ found that plaintiff had the RFC to perform light work, and that she was able to understand instructions, respond to supervision, and deal with changes in a work setting. (T. 20).  In addition, plaintiff could understand, carry out, and remember simple instructions and use judgment.  She could respond appropriately to supervision, co-workers, and usual work situations. (T. 20-21).  However, the plaintiff could not work in places where she would have constant exposure to constant loud noise. (T. 21).  The ALJ engaged in a lengthy analysis which I will discuss further below in conjunction with the plaintiff's arguments. (T. 21-28).

The ALJ then found that plaintiff could not perform her past relevant work, but at step five, he found that she could perform other work which existed in significant numbers in the national economy. (T. 28-29).  In making his step five determination, the ALJ determined that plaintiff's additional limitations "had little or no effect on the occupational base of light work." (T. 29).  The ALJ utilized Medical Vocational Rule 202.21[9] and found that plaintiff was not disabled under that framework.

## V.    ISSUES IN CONTENTION

Plaintiff raises the following arguments in support of her position that the ALJ's decision is not supported by substantial evidence:

1.    The ALJ's mental RFC determination is not supported by substantial evidence. (Pl.'s Br. at 9-12) (Dkt. No. 7).

2.    The ALJ's Step Five determination is not supported by substantial

---

[9] The Medical Vocational Guidelines, known as "the Grids," appear in Appendix 2 of the Social Security Regulations. 20 C.F.R. Pt. 404, Subpt. P. App. 2, §202.21.

evidence.[10] (Pl.'s Br. at 12-20).

Defendant argues that the Commissioner's decision is supported by substantial evidence. (Def.'s Br. at 6-20) (Dkt. No. 12). For the following reasons, this court agrees with the defendant and will affirm the Commissioner's final decision.

## VI.   RFC/Weight of the Evidence/Consistency

### A.   Legal Standards

#### 1.   RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R.

---

[10] This argument is broken down into two separate arguments: the ALJ erred in finding that plaintiff's limitations had little or no effect on the occupational base, and the ALJ failed to meet his burden at step five because the VE did not testify to specific jobs that plaintiff could perform.

§§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

## 2. Weight of the Evidence

In making a disability determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. *See* SSR 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether

the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d).  The ALJ must clearly state the legal rules that he applies and the weight that he or she accords the evidence considered.  *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

The regulations regarding the evaluation of medical evidence were amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded.  According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion."  Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a).  Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors."  20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

### 3.    Credibility/Consistency

In evaluating a plaintiff's RFC for work in the national economy, the ALJ must take the plaintiff's reports of pain and other symptoms into account. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  The ALJ must "'carefully consider'" all the evidence

presented by claimants regarding their symptoms, which fall into seven relevant factors including 'daily activities' and the 'location, duration, frequency, and intensity of [their] pain or other symptoms.'" *Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 404.1529(c)(3); Social Security Ruling (SSR) 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 81 FR 14166-01 at 14169-70, 2016 WL 1020935 (Mar. 16, 2016)).

In 2016 the Commissioner eliminated the use of term "credibility" from the "sub-regulatory policy" because the regulations themselves do not use that term. SSR 16-3p, 81 FR at 14167. Instead, symptom evaluation tracks the language of the regulations.[11] The evaluation of symptoms involves a two-step process. First, the ALJ must determine, based upon the objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).

If so, at the second step, the ALJ must consider "'the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the [objective medical evidence] and other evidence to decide how [the claimant's] symptoms affect [her] ability to work.'" *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015) (citing inter alia 20 C.F.R. § 404.1529(a); *Genier v. Astrue*, 606 F.3d at 49) (alterations in

---

[11] The standard for evaluating subjective symptoms has not changed in the regulations. Rather, the term "credibility" is no longer used, and SSR 16-3p makes it clear that the evaluation of the claimant's symptoms is not "an evaluation of the claimant's character." 81 FR at 14167. The court will remain consistent with the terms as used by the Commissioner.

original).[12]

If the objective medical evidence does not substantiate the claimant's symptoms, the ALJ must consider the other evidence. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (citing superceded SSR 96-7p).  The ALJ must assess the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ must provide specific reasons for the determination. *Cichocki v. Astrue*, 534 F. App'x at 76.  However, the failure to specifically reference a particular relevant factor does not undermine the ALJ's assessment as long as there is substantial evidence supporting the determination. *Id. See also Del Carmen Fernandez v. Berryhill*, 2019 WL 667743 at *11 (citing *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 744 (S.D.N.Y. 2018)).  "[R]emand is not required where 'the evidence of record allows the court to glean the rationale of an ALJ's decision.'" *Cichocki v. Astrue*, 534 F. App'x at 76 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)).

---

[12] The court in *Barry* also cited SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996) which was superceded by SSR 16-3p.  As stated above, the factors considered are the same under both rulings. The 2016 ruling has removed the emphasis on "credibility."

### B.    Analysis

Plaintiff argues that the ALJ's RFC was not supported by substantial evidence because it did not incorporate any of the limitations listed by the plaintiff's treating NP, Andrea Rosa, in her October 11, 2019[13] Mental RFC Assessment. (T. 1142-47).  In this mental RFC check-box form,[14] NP Rosa states that plaintiff has marked or serious limitations in a variety of areas, including recognizing mistakes and correcting them; identifying and solving problems; using reason and judgment to make work-related decisions; sequencing multi-step activities; cooperating and handling conflict with others; keeping social interactions free of excessive irritability, sensitivity, argumentativeness or suspiciousness; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and staying on task. (T. 1143-44).  In the broad area of "adapting or managing oneself," NP Rosa listed plaintiff as having "marked or serious" limitations in maintaining personal hygiene and attire appropriate to work, responding appropriately to changes in a routine work setting, and dealing with normal work stress. (T. 1145).  Many of the other areas were listed as "moderate limitations," and some were listed as mild. (T. 1143-45).

The ALJ found that this form was "not persuasive or consistent with Exhibit 13F for example." (T. 24).  Plaintiff criticizes the ALJ's opinion because he referred to NP Rosa's mental RFC as a "'check off'" form and argues that the ALJ should not have rejected the evaluation for that reason.  Plaintiff cites *Cirelli v. Comm'r of Soc. Sec.*,

---

[13] Plaintiff's counsel states that the assessment is from March 1, 2019, but cites T. 1142-47. There is only one mental RFC from NP Rosa, located at T. 1142-47; but it is dated October 11, 2019.

[14] The form includes some limited narrative entries.

No. 1:19-CV-3405707, 2020 WL 3405707, at *13 (S.D.N.Y. May 7, 2020), *report-recommendation adopted*, 2020 WL 3402433 (S.D.N.Y. June 19, 2020), in which the court stated that a treating physician's opinion expressed in a "check off" form made it no less reliable.  This basic holding was, and still is, correct.  In *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam), the Second Circuit held that a treating physician's medical opinion was not entitled to controlling weight where it was provided in a check-box form ***and*** was "unaccompanied by meaningful medical evidence in the administrative record." 362 F.3d at 31–32. *See Heaman v. Berryhill*, 765 F. App'x 498, 501 (2d Cir. 2019) (affirming the Commissioner when the ALJ gave "good reasons" for discounting the treating physicians' opinions "including that their opinions were "merely checkbox forms that offer little or nothing with regard to clinical findings and diagnostic results," and, further, were inconsistent with the moderate findings reflected in the doctors' notes . . . .")  Thus, the form of an opinion does not matter, "so long as it is supported by treatment notes in the record." *See Esther Marie H. v. Comm'r of Soc. Sec.*, No. 5:20-CV-668 (TWD), 2021 WL 5629076, at *3 (N.D.N.Y. Dec. 1, 2021) (citations omitted).

Very recently, the Second Circuit reaffirmed that "[n]eedless to say, *Halloran* did not then and does not now stand for the rule that the evidentiary weight of a treating physician's medical opinion can be discounted by an ALJ based on the naked fact that it was provided in a check-box form."[15] *Colgan v. Kijakazi*, 22 F.4th 353, 360-61 (2d Cir. 2022).  In *Colgan*, the Second Circuit held that, unlike the check-box form opinion

_____

[15] The court notes that *Colgan* was decided based on the prior regulations which followed the "treating physician rule," and the medical provider in *Colgan* was a treating physician.

discounted in *Halloran*, the treating physician's form-opinion in *Colgan* was "supported by voluminous treatment notes gathered over the course of nearly three years of clinical treatment. In light of these circumstances, the ALJ's first reason for assigning little weight to Dr. Ward's opinion was erroneous." *Id.* at 362.

In this case, the ALJ did mention that the RFC was a "'check off'" form, but he did not reject the opinions contained therein for that reason alone. The reasons that he gave for finding the RFC "not persuasive," were supported by substantial evidence in the record, distinguishing this case from *Colgan*. (T. 24). In this case, the ALJ found that NP Rosa's RFC form was "not at all consistent with the therapist's treating notes," and that "***in general***, greater evidentiary weight is given to the contemporaneous progress notes of a treating source . . . ."[16] (T. 24) (emphasis added). The ALJ then cited to NP Rosa's contemporaneous notes and found that, although plaintiff complained of various symptoms, the majority of the actual mental status examinations were "mostly normal." (*Id.*) The ALJ cited to specific examinations on specific dates on which, while plaintiff complained of various symptoms and limitations, the mental status examination was normal. (T. 24). *See e.g.* (T. 332, 336, 339-40, 342-43, 349, 355, 363, 370, 618-20). The ALJ did not "pick and choose" only the normal findings observed by NP Rosa.[17] He also cited portions of NP Rosa's treatment notes that

---

[16] The ALJ noted that greater weight is given to contemporaneous treatment notes because they were created for ***treatment***, "unlike a mere 'check off form' that was created for the ***sole purpose*** of assisting the claimant with his/her disability claim." (T. 24). The ALJ may have erred in making this assumption, but any error in this regard was harmless, given the evidence of record.

[17] This also distinguishes *Colgan*, in which the ALJ "cherry-pick[ed] particular instances of improvement from Dr. Ward's treatment notes in order to create an inconsistency within her medical opinion . . . ." 22 F.4th at 362.

indicated that plaintiff occasionally had a "flat" affect, or an "anxious and depressed mood," but the same examination produced other normal findings, including intact insight and judgment. (T. 24-25).  The ALJ stated that "the claimant's 2019 treatment notes, noting mostly normal mental status examination findings support the finding that plaintiff can perform work at the RFC." (T. 25).

In addition, the ALJ considered the opinions of two consultative psychologists, examining consultant, Dr. David Schaich, Psy.D., and non-examining State agency psychological consultant, Dr. H. Ferrin, Ph.D. (T. 25-26).  Dr. Schaich reported mostly normal findings, including cooperative behavior, adequate manner of relating, adequate social skills, coherent and goal-directed thought processes, full affect, neutral mood, intact attention and concentration, intact memory skills, and fair judgment and insight. (T. 25, 618-19).  This report was consistent with NP Rosa's multiple contemporaneous reports, showing mostly normal examination findings, notwithstanding plaintiff's description of more severe symptoms. (T. 26).

The ALJ found "somewhat persuasive" Dr. Ferrin's opinion, which was based upon a record review in August of 2018, and which stated that plaintiff had no limitations in understanding, remembering, or applying information, and that she had no limitations in her ability to interact with others. (T. 25, 88-89).  Dr. Ferrin noted that plaintiff had moderate limitations in her ability to manage herself and in her ability to concentrate, persist, or maintain pace.  However, he noted that "while the claimant may have lapses in focus, motivation, and reliability, the frequency, intensity and duration of these occurrences would not be expected to substantially detract from the claimant's

ability to complete work-like procedures." (T. 26, 97).  He concluded that, although the plaintiff might have some difficulty coping with stressful circumstances, she appeared capable of adapting to workplace changes and making appropriate workplace decisions. (T. 26, 97).

It has been that observed that mental impairments are subject to fluctuations in symptoms, so that the ALJ may not base his RFC "on 'a one-time snapshot of a claimant's status' because that episode "may not be indicative of her longitudinal mental health." *Colgan*, 22 F.4th at 362.[18]  In this case, however, the ALJ noted that NP Rosa observed normal mental status findings on ***most occasions***.  The judge in *Colgan* found that the treating physician's contemporaneous notes were not necessarily inconsistent with her check-box form; whereas, NP Rosa's notes are more clearly inconsistent.  For example, in her check-box form, NP Rosa noted that plaintiff had a "marked or serious limitation" in using reason and judgment to make work-related decisions. (T. 1143).  However, in her contemporaneous notes, NP Rosa regularly stated that plaintiff's thought processes, judgment, and insight were "intact." (T. 332, 336, 340, 343, 349, 355, 363, 370).  During the examinations from December of 2017 to May of 2018, plaintiff's affect was appropriate, her mood was euthymic,[19] her

---

[18] "'Cycles of improvement and debilitating symptoms [of mental illness],' . . . "are a common occurrence . . . ." *Colgan*, 22 F.4th at 362.

[19] Euthymia is defined as "a normal, tranquil mental state or mood" and as "a stable mental state or mood in those affected with bipolar disorder that is neither manic nor depressive." https://www.merriam- webster.com/medical/euthymia.  There no dispute that plaintiff has been diagnosed with bipolar disorder.  The issue is whether plaintiff's condition prevents her from performing substantial gainful activity.  The more often that plaintiff presents with a stable "euthymic" mood and other normal mental findings, the less disabling the symptoms of her impairment might be.

19

activity was normal, her speech was clear, and her attitude was cooperative. (*Id.*)  While plaintiff presented with various symptoms of bipolar disorder (mania and depression) on January 25, 2019, and NP Rosa stated that plaintiff "struggles" with symptoms of bipolar disorder (T. 714, 722), plaintiff's mental examination on the same day again was mostly normal. (T. 722).

NP Rosa checked boxes indicating that plaintiff had "marked" limitation in her social skills, including cooperation and handling conflict with others, keeping social interactions free of excessive irritability, and getting along with co-workers or peers without unduly distracting them or exhibiting emotional extremes. (T. 1144).  However, none of NP Rosa's contemporaneous notes mentioned these limitations. In fact, the notes indicated that plaintiff was cooperative, her mood euthymic, and her affect was appropriate. (*See e.g.* T. 332, 336, 340, 343, 349, 355, 363, 370, 499-500, 504-505, 508).

NP Rosa's mental RFC noted that plaintiff had "marked" limitations in maintaining personal hygiene and attire appropriate for work. (T. 1145).  However, NP Rosa's contemporaneous treatment notes always rate plaintiff's appearance as "within normal limits." (*See e.g.* T. 332, 336, 340, 343, 349, 355, 363, 370, 499, 504, 508).  Dr. Schaich found that plaintiff was casually dressed and "well groomed." (T. 619).  Even when the plaintiff exhibited some symptoms, the remainder of the examination was within normal limits. (T. 1126-27 - report dated August 16, 2019).  Thus, the ALJ's determination that NP Rosa's mental RFC for was "not persuasive" and his reliance on

her contemporaneous treatment notes,[20] together with the opinions of Dr. Schaich and
Dr. Ferrin, was supported by substantial evidence.

The ALJ also considered plaintiff's activities of daily living in his analysis,
including her ability to perform child care duties. (T. 25, 27).  Recognizing that
"[s]ymptoms may sometimes suggest a greater degree of impairment than can be shown
by the medical evidence alone," the ALJ considered the plaintiff's statements, her daily
activities, and other evidence in the record.[21] (T. 27).  While a plaintiff need not be "an
invalid" to be disabled for purposes of Social Security, the ALJ must consider the
plaintiff's daily activities as relate to plaintiff's symptoms. *Vargas v. Comm'r of Soc.
Sec.*, No. 20-CV-4363 (PKC), 2022 WL 462392, at *8 (E.D.N.Y. Feb. 15, 2022) (citing
*Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998); 20 C.F.R. § 404.1529(c)(3)(I) (the
Commissioner considers daily activities as relevant to a claimant's symptoms)).

In this case, plaintiff testified that she did very little to take care of her children,
and that her husband did most of the chores, including most of the children's
preparation for school. (T. 74-75).  Although plaintiff testified that she had a hard time
getting out of bed, she also stated that she helped get the children ready for school, even

---

[20] The ALJ did not specifically mention NP Rosa's statement that plaintiff would be absent or
late for work four or more days per month.  However, he stated that the form-opinion in general was
less persuasive that NP Rosa's contemporaneous treatment notes, this impliedly rejecting this opinion
as well.  There is no discussion of absenteeism in NP Rosa's treatment notes.  Although NP Rosa
indicates that plaintiff has a marked limitation to being "on task," there are no references in the mental
status reports to any deficit in attention and concentration, and Dr. Schaich found that plaintiff's
memory, attention, and concentration were "intact." (T. 619).

[21] The ALJ undertook a "consistency" analysis. (T. 27).  Although plaintiff does not specifically
argue that the ALJ's consistency analysis is incorrect, I find that a review of the ALJ's analysis in this
regard further supports his RFC determination.

though her husband put their clothes out for them, and that she spent the rest of the day trying to get the house clean, even though she spent most of the time pacing back and forth. (T. 74).  She told Dr. Schaich that she could dress, bathe, groom herself, prepare and cook food, and do laundry. (T. 620).  She did tell Dr. Schaich that her husband helped her do the things she could not do on her own, and that she socialized "very little." (*Id.*)

Plaintiff told Dr. Schaich that she spent her day taking care of her children when her husband was not there and watching TV. (*Id.*)  She testified, at the time of the hearing in November of 2019, that her children were all school age, thus, presumably, she would not have to take care of her children during the day. (T. 75).  However, in November of 2017, her middle child would have been 3 years old, and her youngest would have been 2 years old.[22]  The three-year-old and the two-year-old were presumably not attending school.  Thus, it is likely that plaintiff did more to care for her children during the relevant time period than she alleged at the hearing, thus, the ALJ's emphasis on child care was not erroneous.

Plaintiff testified that her husband accompanied her to her medical appointments. (T. 76).  She also testified that she could drive, if necessary, but she chose not to drive because of her anxiety. (T. 79).  However, Dr. Schaich noted that plaintiff drove herself twenty miles to the evaluation. (T. 617).  In her July 4, 2018 function report, plaintiff

---

[22] This is based on plaintiff's testimony that her second child was born in 2014 and her youngest child was born in October of 2015. (T. 70).  One of plaintiff's treatment notes states that, on March 8, 2019, she told her therapist Michele Roberts, LCSW that she stayed home with her children: ages 8, 2, and 1. (T. 766).  Based on plaintiff's testimony at the hearing, the ages of her children in that note were incorrect. This error does not change my following analysis because either way, at least two of plaintiff's children were at home during the relevant time period.

stated that she could go out alone if she knew where she was going, knew how to get there, and did not anticipate large crowds. (T. 220).  Plaintiff testified that even speaking on the telephone caused her to have a panic attack. (T. 76).  However, on March 12, 2018, plaintiff reported to her therapist Michelle Roberts that plaintiff was "overwhelmed with all of the meetings/kid issues with school - fighting with schools to get [two of her children] services." (T. 351).

The ALJ concluded that the plaintiff alleged a "homebound" and "bedridden" status to the point where she is not able to talk on the telephone.  However, this level of "debilitation" was never mentioned to any of her treating sources "and shows that the claimant has a tendency to exaggerate the extent of her symptoms."[23] (T. 28).  Taking all of the evidence into consideration, the ALJ determined that plaintiff had "greater functional abilities that she alleges . . . ."[24] (T. 27).  It was the province of the ALJ to resolve the conflicts in the evidence and to determine plaintiff's RFC based on all the evidence. *Anselm v. Commissioner*, 737 F. App'x 552, 556 (2d Cir. 2018) (citing, inter alia, *Veino v. Barnhart*, 312 F.3d 578, 588-89 (2d Cir. 2002); *Mongeur*, 722 F.2d at 1038). The ALJ's RFC determination was supported by substantial evidence.

---

[23] The court notes that, during the hearing, plaintiff testified that her depression became so severe that she had "suicidal ideology [sic]." (T. 70-71).  However, none of the plaintiff's treatment notes after the date of onset mention this.  In fact, all of the notes indicate otherwise. (*See e.g.* T. 332, 336, 340, 343, 349, 355, 363, 370, 500, 504, 508).

[24] The ALJ also considered plaintiff's statements to physicians who she was seeing for physical conditions.  (*See e.g.* T. 28 n.2).  During a March 19, 2019 visit to Dr. Brad Dworkin, M.D. for her gastroparesis, plaintiff denied depression and anxiety. (T. 1139).  The court notes that plaintiff's treatment records indicate that her depression was "resolved" as of February 27, 2019. (*See e.g.* T. 763).

## VII.  **Step Five Determination**

### A.  **Legal Standards**

"At step five, the burden shifts to the Commissioner to show there is other work that [the claimant] can perform." *Kristen B. v. Comm'r of Soc. Sec*., No. 5:20-CV-0032 (ML), 2021 WL 950509, at *13 (N.D.N.Y. Mar. 12, 2021) (citations and internal quotation marks omitted) (alterations in original). *See* 20 C.F.R. § 404.1520(a)(4)(v). An ALJ may make this determination either by applying the Medical Vocational Guidelines, commonly known as "The Grids," or by adducing testimony of a vocational expert. *McIntyre v. Colvin*, 758 F.3d 146, 151 (2d Cir. 2014).  The Grids reflect a disability determination based upon various exertional categories, together with a consideration of age, education, and prior work experience. 20 C.F.R. Pt. 404, Subpt. P, App.2.[25]

When the individual has non-exertional impairments, the ALJ may be required to consult a VE in order to make the disability determination. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (citations omitted).  However, "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert" or "preclude reliance on the [Grids]." *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986); *Merriman v. Comm'r of Soc. Sec*., 2015 WL 5472934, at *13 (S.D.N.Y.

---

[25] The Grids reflect a consideration of various vocational factors (i.e., age, education, and work experience) in combination with the individual's RFC (used to determine his or her maximum sustained work capability for sedentary, light, medium, heavy, or very heavy work) and evaluate the individual's ability to engage in substantial gainful activity other than his or her past relevant past work. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a). "Where the findings of fact made with respect to a particular individual's vocational factors and [RFC] coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." *Id.*

Sept. 17, 2015)(an ALJ is not precluded from exclusively using the Grids).  The non-exertional impairment must "'significantly limit the range of work permitted by his exertional limitations,' [then] the ALJ is required to consult with a vocational expert." *Zabala*, 595 F.3d at 410 (citations omitted).

### B.    Analysis

In this case, the ALJ heard the testimony of a VE, but only asked the VE to discuss plaintiff's past relevant work. (T. 83-83). He asked that the VE classify plaintiff's former work, its DOT[26] code, how long the job took to learn, and its exertional level. (*Id.*)  The ALJ asked the VE to consider an individual of plaintiff's age education, and prior work experience, who could not regularly attend a job site because she could not consistently get out of bed or even leave the house. (T. 83)  The VE testified that such an individual could not perform any "full-time gainful employment." (*Id.*)  Plaintiff's counsel opted not to question the VE. (T. 84).

The ALJ used his step four determination that plaintiff was capable of light work.[27] (T. 29).  Based on plaintiff's age, education, and prior work experience, the Medical Vocational Guideline for such an individual, who could perform a "full range of light work," would be section 202.21.  Section 202.21 directed a finding of "not disabled." (T. 29). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.21.  The ALJ then evaluated plaintiff's mental (non-exertional) impairment to determine whether any further limitations would apply. (*Id.*)  The ALJ recognized that plaintiff had additional

---

[26] Dictionary of Occupational Titles.

[27] Plaintiff does not dispute this exertional determination.

limitations, but found that "the additional limitations noted in the RFC have little or no effect on the occupational base of unskilled light work," thus, a finding of not disabled was appropriate under the "framework" of the guidelines. (*Id.*)

In making this determination, the ALJ considered the basic mental demands required to perform "unskilled" work, based on SSR 85-15. (*Id.*)  He determined that, notwithstanding the limitations placed on plaintiff by her mental impairment, she would still be able to perform those demands.  He found that plaintiff could also perform other basic activities required for unskilled work, including the ability to understand instructions; respond to supervision; deal with changes in a routine work setting; understand, carry out, and remember simple instructions; use judgment; and respond appropriately to supervision, co-workers, and ususal work situations. (*Id.*)

Plaintiff argues, based on NP Rosa's mental RFC, that plaintiff had more limitations than those assumed by the ALJ, and that the ALJ's finding that plaintiff's limitations had little or no effect on the occupational base of work was not supported by substantial evidence. (Pl.'s Br. at 14-15).  Because this court has found that the ALJ properly rejected the marked restrictions contained in NP Rosa's mental RFC, plaintiff's first argument cannot succeed.  In his decision, the ALJ specifically outlined the basic demands and activities discussed in SSR 85-15, and included them in the RFC.  The Second Circuit has affirmed the use of the Grids in such a situation. *See Woodmancy v. Colvin*, 577 F. App'x 72, 76 (2d Cir. 2014) (affirming the use of the Grids when, notwithstanding a severe mental impairment, plaintiff "'retain[ed] the ability (on a sustained basis) to understand, carry out, and remember simple

instructions[,] ... respond appropriately to supervision, coworkers, and usual work situations and to deal with changes in a routine work setting.'"). *See Walton v. Comm'r of Soc. Sec.*, No. 6:18-CV-6140, 2020 WL 3964255, at *9 (W.D.N.Y. July 13, 2020) (citing *Woodmancy, supra* and holding that and RFC which allowed for the above demands did not preclude the use of the Grids).

Plaintiff further argues that the ALJ's decision is not supported by substantial evidence because the VE did not list jobs that the plaintiff could perform. (Pl.'s Br. at 17-19). Plaintiff states that the ALJ's finding that plaintiff's bipolar disorder had "little or no impact on the occupational base" was "difficult to reconcile with the ALJ's finding that the plaintiff can not perform her past work as a radiology administrator," which was "semiskilled" work. (Pl. Br. 16). First, the court notes that, according to the VE, plaintiff's former occupation was "skilled," not "semiskilled." (T. 83). Second, the ALJ found that the plaintiff's impairment had little or no impact on the occupational base of "unskilled" light work, not the "occupational base" in general. (T. 29). There is no question that plaintiff is unable to perform her past "skilled work," but that is not the issue at step five, and the ALJ properly articulated the basic demands of "unskilled" work, determining that plaintiff was still able to perform them, which resulted in the ALJ's finding that the "occupational base of unskilled work" was not eroded. (T. 29).

The ALJ consulted a VE, but because the ALJ found that plaintiff could perform the basic demands of unskilled work, and her limitations would not significantly erode the occupational base of unskilled light work, the ALJ was entitled to use the Grids, and the VE was not required to articulate specific jobs that the plaintiff could perform.

SSR 85-15 states that, the Grids "reflect the potential occupational base of unskilled jobs for individuals who have severe impairments which limit their exertional capacities: approximately 2,500 medium, light, and sedentary occupations; 1,600 light and sedentary occupations; and 200 sedentary occupations--each occupation representing numerous jobs in the national economy." SSR 85-15, 1996 WL 56857, at *1.  The ALJ cited these numbers in his decision. (T. 29).  "[T]he Grids take administrative notice of the numbers of unskilled jobs at various exertional levels that exist throughout the national economy."[28] *Guerrero v. Colvin*, No. 16 Civ. 3290 (RJS/ AJP), 2016 WL 7339114, at *22 (S.D.N.Y. Dec. 19, 2016).  The ALJ's RFC was supported by substantial evidence, and within that RFC, the ALJ correctly found that plaintiff had the ability to perform unskilled work.  Plaintiff's limitation to unskilled work takes into consideration all of the limitations imposed by her mental impairment. Thus, the ALJ was not required to include "additional" limitations in the RFC or obtain further information from the VE.

---

[28] Plaintiff states that "[t]he Commissioner also fails to meet the burden of proof at Step Five where the evidence suggests a residual functional capacity for less than sedentary work." (Pl.'s Br. at 19).  However, the ALJ found that plaintiff could perform **light** work, plaintiff does not argue that she is limited to sedentary work, and there is no evidence suggesting such a limitation.  In support of this argument, plaintiff cites one of my previous cases: *Jeffrey C. v. Comm'r of Soc. Sec.*, No. 8:18-CV-94 (ATB), 2019 WL 1228659, at *10 (N.D.N.Y. March 14, 2019).  In *Jeffrey*, I remanded the case to the Commissioner because there was no substantial evidence supporting the plaintiff's ability to perform a full range of sedentary work based on her alleged inability to sit for the required period of time. Because the RFC determination was flawed, I found that the step five determination was flawed, and I remanded for further analysis.  I stated that, *if* on remand, "the Commissioner determines that plaintiff has additional limitations that are inconsistent with the full range of sedentary work, the assistance of a vocational expert will likely be required on remand to support the step five analysis." *Id. Jeffrey C.* is not specifically relevant to this case, but only states the general principal that if the plaintiff cannot perform the full-range of a particular exertional category of work for whatever reason, the ALJ *may* be required to consult a VE.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the decision of the Commissioner is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

**ORDERED**, that the Clerk enter judgment for the **DEFENDANT**.

Dated: February 25, 2022

_____

Andrew T. Baxter

U.S. Magistrate Judge